**REDACTED**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:10mj97 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | March 4, 2010 |
| ANTHONY JOSEPH TRACY, | . | 10:00 a.m. |
| | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . . . .

TRANSCRIPT OF CIPA HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          GORDON D. KROMBERG, AUSA
                             JEANINE LINEHAN, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314

FOR THE DEFENDANT:           GEREMY C. KAMENS, ESQ.
                             Office of Federal Public Defender
                             1650 King Street, Suite 500
                             Alexandria, VA 22314
                               and
                             ARJUN GARG, ESQ.
                             Kirkland & Ellis LLP
                             655 - 15th Street, N.W.
                             Washington, D.C. 20005

COURT SECURITY OFFICER:      CHRISTINE E. GUNNING

ALSO PRESENT:                SA THOMAS EYRE
                             SA JOSEPH MITEK

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 38)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**REDACTED**

2

1                        P R O C E E D I N G S

2                          (Defendant present.)

3            THE CLERK:  Magistrate Case 1:10-97, United States of

4    America v. Anthony Joseph Tracy.  Would counsel please note their

5    appearances for the record.

6            THE COURT:  Ms. Gunning, do you want to check?

7            MS. LINEHAN:  Good morning, Your Honor.  Jeanine Linehan

8    for the United States along with Gordon Kromberg and Special Agent

9    Thomas Eyre from Immigration and Customs Enforcement.

10           THE COURT:  All right, good morning.

11           MR. KAMENS:  Good morning, Your Honor.  Geremy Kamens on

12   behalf of Mr. Tracy, who's present.  With me as well is an

13   associate from Kirkland & Ellis named Arjun Garg, who has agreed

14   to assist in the representation of Mr. Tracy on a pro bono basis.

15   He has prepared a pro hac vice application.  He has also been

16   cleared for participation in this matter.

17           THE COURT:  All right.  Ms. Linehan, just for the

18   record, there's a gentleman sitting on your side.  Who is that,

19   please?

20           MS. LINEHAN:  Yes, Your Honor.  That is Special Agent

21   Joe Mitek.  He also has the necessary clearances to participate in

22   today's hearing.  He's from the Federal Bureau of Investigation.

23           THE COURT:  From the FBI, all right.

24           Before we get to the -- I've had this hearing sealed

25   because I believe that at least at the Secret level information

1  may be discussed, and out of an abundance of caution, we have

2  sealed this hearing.

3       Now, my practice is with a case of this sort where there

4  is classified information -- and I want the parties to be able to

5  discuss that because it's relevant in my view to the issue before

6  us -- is that once the transcript has been -- I will direct that

7  the transcript be prepared from this hearing.  It will be

8  submitted then to the appropriate intelligence agencies for

9  classification review, and if it's completely unclassified, then

10  the transcript will be publicly available, which I think fulfills

11  our obligation to be an open court.

12       If there are portions of the transcript that are deemed

13  classified, then a redacted version of the transcript can be made

14  publicly available, but that's how I will handle at least at this

15  point any tension that we have between the concept of an open

16  court system, First Amendment rights of the press and the public

17  to be aware of what we're doing against the national security

18  interests of the United States, and unless I hear an objection,

19  that's how we're going to proceed today and in any other matters,

20  hearings where there might be classified information.

21       Is there any objection to proceeding that way?

22       MS. LINEHAN:  No, Your Honor.

23       THE COURT:  Mr. Kamens?

24       MR. KAMENS:  We have no objection.  As I understand it,

25  the government may have some reservations about speaking about

4

1   some classified information that can be conveyed to the defendant.

2   We would ask that, of course, his presence be an important part

3   of this proceeding.

4           THE COURT:  We'll face that issue when we get to it.

5           MR. KAMENS:  Thank you.

6           THE COURT:  All right.  So that's the first housekeeping

7   matter.  The second matter is because of the nature of this case,

8   if the case proceeds to indictment, when that happens,

9   Ms. Linehan, tell the Clerk's Office the case is assigned to this

10  Court, because there should be, I think, continuity at this point.

11          The third thing is I have from the defense a -- sorry,

12  from the government a motion to waive speedy trial and to allow an

13  additional 30-day time period for the government.  There has not

14  been a response from the defense.  Is there an objection?

15          MR. KAMENS:  There is, Your Honor.

16          THE COURT:  And the basis?

17          MR. KAMENS:  We received this yesterday.  We appreciate

18  the candor shown by the government in their motion.  Essentially,

19  as I understand it, the government seeks to continue the time for

20  indictment because they haven't confirmed any information that

21  they've received from Mr. Tracy.  More importantly, they haven't

22  identified a single Somali at issue in the complaint who has come

23  to or entered the United States.

24          The government cites a number of provisions from 3161,

25  specifically the (h)(7), which is the interests of justice

1  provision of the Speedy Trial Act.  What they do not cite is
2  (h)(7)(C), which says, "No continuance under subparagraph (A) of
3  this paragraph shall be granted because of general congestion of
4  the court's calendar, or lack of diligent preparation or failure
5  to obtain available witnesses on the part of the attorney for the
6  Government," and essentially what the government has alleged in
7  their motion is that they have not found witnesses to substantiate
8  their allegations in the complaint, and the Speedy Trial Act
9  specifically provides that that is not a basis for a continuance
10 and it does not exclude it.

11       We ask that the Court deny their motion and require them
12 to indict by Monday or within 30 days.  If Monday is the 31st day,
13 there may be an issue about whether the 30th day falls on a
14 Sunday, whether that includes the following Monday, given that the
15 statute says within 30 days.

16       However, be that as it may, we ask that the Court deny
17 the government's motion.

18       THE COURT:  All right.  Ms. Linehan?

19       MS. LINEHAN:  Certainly Your Honor has seen what we laid
20 out in our motion.  I would add to that in response to Mr. Kamens
21 this isn't a situation where the government has not been diligent.
22 This is an unusual situation where the government was forced to be
23 in a reactive mode on January 18 to statements, voluminous
24 statements made by the defendant.

25       In other words, Your Honor, this isn't a lack of

6

1  preparation on behalf of the government in waiting until January
2  18 to investigate something.  This was the defendant's actions in
3  returning to the U.S. and giving admissions of participating or
4  running a visa fraud business, and it was those statements from
5  that point forward that the government began to investigate and
6  certainly arrested the defendant, moved with alacrity to get the
7  defendant brought before the magistrate judge by virtue of the
8  complaint.

9         It's the defendant who indicated that there are 271 or
10  272 Somalis that he assisted to get into this country through the
11  use of fraudulent documents that he obtained for them.  Since that
12  time, since the government was made aware of that through the
13  defendant's confession, the government has done an extraordinary
14  amount of investigation, with over 15 subpoenas sent out,
15  approximately, Your Honor, and please don't hold me to the correct
16  number, but I believe 12 search warrants of various e-mail
17  accounts and cell phones, and collateral leads to other
18  investigative entities throughout the world.

19         There have been around-the-clock attempts to locate
20  individuals through certain methods, and we are working tirelessly
21  to corroborate some of what the defendant has said.  So I would
22  respectfully disagree with Mr. Kamens' assertion that the
23  government has not been diligent.

24         This is extraordinary in the way that the defendant
25  himself told us that there are 272 Somalis in this country by

1   virtue of his fraud, and in order to corroborate his statements,
2   we are working to find those people, and we need additional time
3   to get the results of those subpoenas, to get the results of those
4   search warrants, and we don't believe that it's from lack of
5   diligence.

6            In addition to that, Your Honor, there was this issue of
7   the snow closure.  We lost approximately a week in our 30-day
8   period of time to indict as a result of the unusual snow closure.

9            THE COURT:  All right.  Is it your representation to the
10  Court that before January 18, 2010, this man was not under
11  criminal investigation?  Are you able to tell the Court that?

12           MS. LINEHAN:  As fairly as I can put that, I can tell
13  the Court that a federal agent was aware of the defendant's
14  activities as a result of e-mail traffic, that the defendant made
15  certain statements about the business he was conducting related to
16  these smuggling efforts, that that law enforcement agent
17  communicated to the defendant that he should not do that and
18  should return to the U.S. immediately to meet with that agent.

19           So I can say that the federal government was aware of
20  what the defendant was representing that he was doing in Kenya,
21  but at that point, a criminal investigation into that conduct had
22  not been initiated.

23           THE COURT:  And roughly how far before January of 2010
24  was that information coming to the government's attention?

25           MS. LINEHAN:  If I could consult for one minute, Your

1   Honor?

2           Your Honor, it's my understanding that that written

3   communication was by e-mail in July of 2009 but was not read by

4   that agent until September.

5           THE COURT:  Well, is this the agent who was handling the

6   defendant?

7           MS. LINEHAN:  That's correct.

8           THE COURT:  So, I mean, this is not even classified,

9   because the defendant told Pretrial Services, and their report's

10  not been classified, that he was working for the Department of

11  Defense in that time period.

12          MS. LINEHAN:  Well, Your Honor, the agent I'm referring

13  to --

14          THE COURT:  -- is not from the Department of Defense?

15          MS. LINEHAN:  Right.  It was an ICE agent that the

16  defendant was working with for a period of time before he began

17  some other work.  So I'm referring to an ICE agent, that the

18  communication was between the defendant and an ICE agent about

19  his, his smuggling efforts, that he had started a travel business

20  and that he was smuggling people into the U.S. through Cuba, South

21  America, Mexico, and so forth.

22          THE COURT:  Well, then the government had been on notice

23  that there was potential criminal activity going on here and could

24  very well have started that investigation at that time period.

25          MS. LINEHAN:  Agreed.  What we're asking Your Honor is

1  that you understand that the Eastern District of Virginia and the

2  ICE agents working from January 18 forward, when we encountered

3  the defendant and he provided confirmation of the previous e-mail

4  back in July and additional information, failed a polygraph test

5  about things that were of national security interest, that at that

6  moment, all of the authorities collectively agreed that the

7  defendant should be complainant, and we moved forward from that

8  part.

9          THE COURT:  All right.  Given, No. 1, what is an almost

10 established practice in this jurisdiction that the Public

11 Defender's Office, I don't think I've ever seen them object in the

12 past to a brief request -- a request for a brief extension of the

13 time in which to indict, in fact, I frequently get second

14 requests, secondly, this is an unusual case, the Court will take

15 judicial notice of the fact that Somali in particular is one of

16 those hot button nations that may pose, particularly people coming

17 into this country illegally, unique national security concerns

18 which the Court feels have to be addressed carefully.

19         This is not a case in which the government has had a

20 prolonged opportunity to investigate these particular allegations,

21 and I can understand and I think it is reasonable to make sure

22 that the case is adequately investigated.  While there is probably

23 on the defendant's statements alone sufficient probable cause to

24 get an indictment right now, it's to his benefit as well to make

25 sure the government really does have its ducks in a row, and a

1  30-day extension, especially because I think it could easily say
2  that one week of the time period would not be countable -- would
3  be excludable time anyway because of the crisis in the national
4  government in terms of the weather, the federal government was
5  closed for several days, I'm going to grant the motion, but there
6  won't be any further extensions, and no matter what problems you
7  hit in your investigation, if you're not ready to indict, then
8  you'll have to dismiss the complaint.
9                MS. LINEHAN:  Understood.
10               THE COURT:  So I'm going to grant the order.
11               All right.  Now, that leaves as the next matter the
12  defendant's motion for the Court to reverse Judge Buchanan's
13  decision.
14               MR. KAMENS:  Your Honor, I appreciate the Court's
15  ruling --
16               THE COURT:  Yes.
17               MR. KAMENS:  -- and I would note our exception.
18               We would note that the statute itself specifies that no
19  extension should be granted not just for lack of preparation but
20  also for the government's failure to identify witnesses.  That's
21  what they've said.  The statute excludes it, and so we preserve
22  our exception.
23               THE COURT:  I understand that, but I'm going to overrule
24  the objection.  I think there are extraordinary and exceptional
25  circumstances here that in the interests of justice justify a

1  brief extension, and as I've said, this type of an extension is so
2  common in this district that it's surprising to me that there was
3  any objection.  If it were a 90-day or a four- or five-month
4  extension, I could see the objection, but 30 days is -- and it's
5  probably only 23 days if you really count it correctly.

6         MR. KAMENS:  Well, I will say if our client was not
7  detained at Alexandria Detention Center, we might have a different
8  view.  However, the government has sought his detention as well,
9  and that's why we're here.

10        THE COURT:  I understand that.  And also, I don't know
11 whether in calculating the time period the time that this motion
12 has been pending was excluded, in other words, you know, all those
13 fancy exclusions that apply, I doubt that this is even a full
14 30-day extension.

15        MS. LINEHAN:  It's not.  We didn't calculate that, Your
16 Honor.

17        THE COURT:  Yeah, all right.  So again, I don't find
18 that there's going to be any violation of the Speedy Trial Act in
19 this respect.

20        All right.  Now, the next issue is, as we said, the
21 defendant's motion for release, and I've had a chance to read the
22 Pretrial Services report, I've read the defendant's memorandum,
23 and I've read the government's opposition.  I have also read and
24 have with me on the bench the classified document, which is the
25 defendant's proffer that's been provided to the Court.

12

1          The proffer itself creates in my mind additional
2   problems, and that's the classified stuff that's before the Court.
3          Mr. Kamens, you need to tell the Court, what's your
4   understanding of the full extent of your client's work for the
5   federal government, time period, and agency?  Because there
6   appears to be some conflicts in the information that I've got
7   here.
8          MR. KAMENS:
9
10
11
12
13
14
15          Mr. Tracy is married to a Somali woman.  They have five
16  children together.  As I understand it, his extended family
17  resides in Somalia, that is, his in-laws.
18
19
20
21          He stayed there for several months, but then he came
22  back, and then he returned to Kenya several months thereafter,
23  residing for a short period of time.
24
25

9          THE COURT:  Now, hold on a second.  He was arrested in
10  January as well, correct?
11          MR. KAMENS:  I believe his arrest date was February 5.

17          All of the information that Mr. Tracy provided here
18  about his visa business and how he had heard rumors that
19  individuals were coming into the United States through Cuba, that
20  was all provided with the hope from Mr. Tracy's part that he was
21  providing valuable information that he would receive payment for,
22  not that he was involved in any kind of criminal enterprise.
23          The allegation here is simply that he was providing
24  Cuban -- helping people to obtain Cuban travel visas to travel to
25  Cuba, that he did not assist anybody to travel directly into the

1  United States, that he didn't help anybody to travel from Cuba
2  outside of Cuba, but that he had heard rumors about people
3  traveling from Cuba into the United States, and he felt that it
4  was valuable information that he wanted to provide to the United
5  States, and that's why he did so.

6          As I understand it -- and I don't have anything to back
7  this up -- the FBI was not involved very early on in this case,
8  that Mr. Tracy, when he returned for his third and final trip to
9  Kenya, he was kidnapped by people he was later told were Kenyan
10 police, who were not acting within their lawful authority.  They
11 kidnapped him, took his passport.  He was required to make payment
12 to them.

13

14

15

16

17

18

19

20

21          He was told to come back to the United States.
22                          He did so.

23

24

25

1   He was asked to provide a search of his home.  He did.  He's been
2   extremely cooperative.

3             And he was arrested on February 5 based upon allegations
4   that have never before fallen in a published case within the
5   compass of 1324.  In our research, we have not found a single case
6   in which an individual has been prosecuted for encouraging aliens
7   to come to the United States based on the facts of facilitating
8   travel to a third country that's not a border, and there's no
9   allegation that he was involved in helping people -- or was
10  involved in the conspiracy to help people come into the United
11  States after that.

12            The government alleges in their criminal complaint that
13  they have two individuals that they know the names of that
14  supposedly are Somali and came to the United States.  The initials
15  are K.A. and D.H.  They allege that in the criminal complaint.  Is
16  it that hard to -- if they know the individuals' names, to find
17  out whether those individuals are in the United States?

18            They allege in a paragraph of the complaint that they've
19  searched Facebook accounts for individuals who are Mr. Tracy's
20  contacts, individuals who live in the United States and are
21  African American.  That is one of the important allegations in the
22  complaint.  Is it that hard to find out whether those individuals
23  are Somalis, traveled to Cuba, are lawfully in the United States?
24            THE COURT:  Now you're trying to some degree to reargue
25  the Speedy Trial Act issue, and I've ruled on that.

16

1          MR. KAMENS: And I apologize. I'm referring
2   specifically to the weight of the evidence, which is a
3   consideration under detention, and I think that the government's
4   motion for the continuance also bears on the Court's consideration
5   and evaluation of the weight of the evidence against this man,
6   which is a consideration under 3142, the strength of the case
7   against the defendant.
8          THE COURT:
9
10
11
12          MR. KAMENS: With the Court's indulgence -- well, I
13   won't speculate.
14          MS. LINEHAN: Your Honor, I can speak to that.
15          THE COURT: Yeah.
16          MS. LINEHAN:
17          MR. KAMENS:
18
19          THE COURT: Now, there are what, three trips to Kenya or
20   two?
21          MR. KAMENS: Three.
22          THE COURT: Is it your position that all of them were
23   paid for by the United States government?
24          MR. KAMENS:
25

1
2
3
4
5
6
7
8
9
10
11              That's not much of a difference.

12         Mr. Tracy had provided information in the past for which

13 he received money.  He went to Kenya this time on the

14 understanding that if he obtained valuable information, he would

15 receive payment, and in this case, he tried to provide valuable

16 information to the government, and they've charged him with a

17 crime, and that's why we're here.

18         THE COURT:  All right.  Ms. Linehan?

19         MS. LINEHAN:  Your Honor, just to confirm, the first

20 trip, the defendant was provided with payment as a incentive to

21 travel to Kenya on the first trip, and it was paid for by someone

22 other than ICE.  Very early into that first trip, that agency

23 decided the defendant was not valuable to them, so his contact

24 with that agency was very short-lived.

25

18

1

2

3

4

5

6

7

8

9

10

11

12        But he said he was never tasked to do anything, he was

13 never directed to do anything because of his interaction with that

14 other agency.  Both of the agencies were well aware that the

15 defendant was someone that was considered at that point to be

16 going rogue, for lack of a better term.  When the defendant

17 started his travel business and communicated to the ICE agent that

18 this is what he was doing, the ICE agent said, "You need to come

19 back to the United States, and we need to meet face to face."

20        The ICE agent never authorized the defendant to create a

21 travel business for the purpose of creating fraudulent documents

22 so that Somalis could get false Cuban visas in Kenya to do this

23 circuitous route to end up in the United States.

24        Based on our information, the government would disagree

25 that the defendant reported that he had heard rumors that these

1    individuals ended up in the U.S.  It's our understanding based on
2    interviews with the FBI and ICE that the defendant told them
3    directly that he knew these people were in the U.S., that he knew
4    that they intended to go to the U.S., and so certainly the
5    defendant's statements alone are enough, as Your Honor indicated,
6    for probable cause that he's committed these crimes.

7            Your Honor is aware and has granted graciously our
8    request for extension so that we can corroborate some of his
9    admissions, but at this point, Your Honor, we have a guy who's
10   admitted to assisting approximately 270 Somalians to get into the
11   United States through the use of fraudulent documents.  We
12   believe --

13           THE COURT:  I'm sorry, you do have the initials of two
14   individuals in the affidavit.  Do you actually have at this point
15   the names of these people?

16           MS. LINEHAN:  We believe that we have leads on one, Your
17   Honor, and the government would disagree with Mr. Kamens that
18   these are people that are easy to find.  As Your Honor knows,
19   these are people that have used fraudulent documents to get into
20   either Cuba or the United States through these other countries.

21           So we believe we have a lead on one based on a return of
22   a search warrant and that one individual might currently be living
23   in Australia, and so we're trying to confirm that.

24           THE COURT:  All right.

25           MS. LINEHAN:  Moreover, Your Honor, I believe that based

1   on the Pretrial Services report, based on what you now know
2   regarding inconsistent information that the defendant and his wife
3   have offered to the Pretrial Services officer, which really
4   concerned Judge Buchanan, I mean, this is a woman who's offering
5   herself as a third-party custodian who originally told the
6   Pretrial Services officer that he was not living with her.  We
7   have direct evidence that he was living in a boarding house,
8   because the agents were there and did a consent search of that
9   boarding house, and we also have his statements that this home
10  that his wife lives in with their children is a place that she
11  chose for herself and her children and got him an apartment for
12  the purpose of his visit.

13          In addition to that, Your Honor, he was never truthful
14  with Pretrial Services nor was his wife about his other wife in
15  Kenya.  He has indicated in e-mail and in statements to law
16  enforcement that he would have gone back to Kenya in February had
17  he had his way.

18          It's the government's belief that he is a significant
19  risk of flight and that if Your Honor were to bond him out, he
20  would likely be gone in a day or two.

21          THE COURT:  All right.  Mr. Kamens?

22          MR. KAMENS:  Your Honor, in paragraph 15 of the
23  affidavit, the government -- the affiant states that he is aware
24  of the alleged full names of the aliens but is using their
25  initials in this affidavit.

1          We would proffer, if we are allowed to do if the Court
2   would allow in this de novo hearing, that one of the individuals
3   is an American citizen and one is an Australian citizen.  Neither
4   of them were smuggled into the United States, and as a general
5   matter, the defendant denies that he ever assisted or helped any
6   Somalis to illegally enter the United States.

7          The government continues to repeat that, that there are
8   confessions to that effect, but he denies it, and so for purposes
9   of this hearing in evaluating the weight of the evidence, you have
10  a denial from the defendant, the government says they have a
11  confession and nothing to corroborate it.  Not one Somali at issue
12  in the complaint has been found to be in the United States.

13          With respect to --

14          THE COURT:  Well, I have -- but the affidavit was sworn
15  to under the penalty of perjury by a law enforcement officer, so
16  there is an indicia of reliability in that.  I have from you
17  simply a proffer.

18          MR. KAMENS:  As the statute allows at this stage.  3142
19  says the defendant is allowed to proffer, because otherwise,
20  they're hamstrung at the detention hearing and potentially lose
21  their right to remain silent at trial.

22          THE COURT:  All right.  But I'm just saying that's the
23  status of the evidence at this point.

24          MR. KAMENS:  And that's a fair point, but the statute
25  doesn't provide any presumption of reliability of the affidavit as

1  opposed to a defendant's proffer.  Otherwise, the government would

2  always win in these battles of evidence.

3        We are in a position now at this early stage of this

4  proceeding to proffer information.  I have additional information

5  I'd like to proffer as well.

6        THE COURT:  All right.

7        MR. KAMENS:  First, with respect to the defendant's wife

8  in the United States, I spoke with her this morning.  She wants

9  Mr. Tracy to come back.  She told the FBI that on this Sunday,

10  when she was interviewed by them.

11        Mr. Tracy sent money to her while actually she was

12  living in Baltimore at that time when he was overseas.  He is a

13  good husband.

14        THE COURT:  Well, how much did he send her?  I

15  understand from Pretrial Services she's living on public

16  assistance.

17        MR. KAMENS:  She was unable to say how much money.  It

18  was several hundred dollars, and I believe it was multiple

19  occasions.

20        When I asked her about whether she is living on

21  assistance this morning, there may have been a communication

22  barrier.  I said, "Are you, are you living in subsidized housing?"

23  She didn't seem to agree that she was.  Her sister had helped her

24  pay the rent this month.

25        She may be receiving food aid or welfare, but in terms

23

1  of her housing, I don't know if it's subsidized housing or not.

2  In any event, the defendant according to her did help her by

3  providing money when he was overseas.

4       The defendant has five children, ages 10, 8, 6, 5, and

5  2.  Ms. Lul is not here today, that is, the defendant's wife is

6  not here today because the youngest is sick.  She did appear at

7  the initial detention hearing.

8       With respect to the wife in Kenya that the government

9  alludes to, the defendant denies that he has a wife in Kenya.  He

10 admits that he did have an Islamic ceremony with his girlfriend in

11 Kenya.  She is not his lawful wife.  He has one wife.  She's in

12 the United States.

13      She is aware of the girlfriend in Kenya.  She was upset

14 about it and jealous, and that is why when Mr. Tracy originally

15 returned, he was living in a boarding house.  However, his wife

16 wants him to live with her, and she is a suitable third-party

17 custodian, as is specified in the Pretrial Services report.

18      She does have a landline, and she's willing to provide

19 electric monitoring if that's something that would be ordered by

20 the Court, although we don't think it's necessary.

21

22

23

24

25

1

2

3

4

5          That is all we have to proffer, Your Honor.  We do have

6   argument.

7          THE COURT:  All right.  Was there any other proffer the

8   government wanted to make?

9          MS. LINEHAN:  Regarding the fact that the wife has been

10  on assistance, Your Honor, the defendant did indicate when he was

11  interviewed by two of the agents that he made $90,000 --

12          THE COURT:  90?

13          MS. LINEHAN:  $90,000 --

14          THE COURT:  That's what I thought.

15          MS. LINEHAN:  -- with his Noor Services company in

16  Kenya.

17          And the wife was unaware when she spoke to Pretrial

18  Services as to what the defendant was doing in Kenya, so certainly

19  if he profited to that extent, if he had an ongoing relationship

20  with his wife and his children, he would have sent an amount more

21  than a couple hundred dollars every now and again.

22          THE COURT:  Mr. Kamens?

23          MR. KAMENS:  Your Honor, he denies that he ever made

24  $90,000.  He was there from April until early January.  With the

25  amount of money he --

1        THE COURT:   Take a look at the Pretrial Services report.

2   Doesn't he indicate there that his income was 5 to 6,000 dollars a

3   month?  So that might not be 90,000.  I think that would be, what,

4   72,000 a year.  Whatever it is, did I read that correctly?

5        MS. LINEHAN:  Yes, Your Honor, he did.

6        THE COURT:  Yeah.  So whatever that is, that's a

7   significant amount of money.  For someone who is truly attached to

8   a wife and five children, you would expect that there would be

9   more than an occasional hundred dollars or so going to that

10  family.

11       MR. KAMENS:  Well, it doesn't specify whether that's

12  gross or net, Your Honor.

13       THE COURT:  Well, we're getting to fine points at this

14  point.  I'm reviewing the decision of the magistrate judge, who

15  also conducted an extensive hearing on this matter, and you said

16  that the wife was -- didn't she testify during that hearing, or

17  she was present in the courtroom?

18       MR. KAMENS:  She was present in the courtroom.  The

19  information was proffered.

20       THE COURT:  All right.

21       MR. KAMENS:  Your Honor, if that is significant to the

22  Court, then we'd ask the Court to allow her to testify under oath,

23  and she's prepared to do so.  When I spoke with her this

24  morning -- she doesn't drive.  She has to get a ride here.  She

25  was unable to do so because her two-year-old is very sick.

1  However, she is willing to testify and state to the Court all of

2  the things that I've mentioned and proffered and more, I'm sure.

3          And she provided information to the government this

4  Sunday.  Perhaps they have additional statements from her that

5  corroborate exactly what she said.  But she is willing to be a

6  third-party custodian, is willing to allow the defendant to reside

7  with her, and he doesn't have any of the kind of assets that the

8  government suggests that he does.

9          THE COURT:  When the defendant was arrested, was there

10 anything unique found on his person, amounts of cash?

11         MS. LINEHAN:  No, Your Honor.  The way it was described

12 to me by the law enforcement agents that encountered him at JFK,

13 he came in knowing that he'd be encountered.  In other words, he

14 had nothing on him but what he was wearing and, I believe, a

15 laptop computer -- not even a laptop computer.

16         So they said it was clear to them that he knew he was

17 going to be encountered by a large number of law enforcement

18 individuals and that he had virtually nothing on him, no cash,

19 nothing.

20         THE COURT:  Did he have a suitcase?

21         MS. LINEHAN:  A suitcase, yes, but nothing of any

22 significance.  No records, no -- and I've pointed out in the

23 response that I did to the motion to review the bond determination

24 that very little items were found in his boarding house where he

25 was living:  his U.S. passport and, I believe, two domestic cell

27

1  phones.

2          THE COURT:  And the passport that was supposedly stolen

3  or taken, what was the timing of that again?

4          MS. LINEHAN:  Your Honor, I believe it was November of

5  2009.  That's what he alleges occurred.  We have absolutely no

6  proof that that happened.

7          THE COURT:

8

9

10          MS. LINEHAN:  Yes.

11          THE COURT:  All right.

12          All right, I'll hear any arguments, Mr. Kamens, to your

13  motion.

14          MR. KAMENS:  The first two considerations under 3142 for

15  the Court are the nature of the case and the weight of the

16  evidence against the defendant.  The nature of the case if it

17  involves firearms or violence or drugs are considerations that

18  weigh in favor of detention.

19          A case such as this one involving the allegation of

20  assisting individuals to obtain Cuban travel visas is not the type

21  of case that would weigh in favor of detention.  In particular,

22  we're not dealing with the production of fraudulent identification

23  here, either U.S. identification or fake Cuban travel documents

24  made in the back room somewhere.

25          The allegation is that Mr. Tracy helped individuals

1  obtain a valid Cuban visa using hotel reservations, residence
2  documents, and flight tickets that were submitted to the Cuban
3  embassy.

4          So -- and the reason I raise that is that it might be a
5  different case if an individual had the ability to create travel
6  documents on their own such that that might suggest to the Court
7  this is a person who has the ability to fabricate legitimate
8  travel documents and perhaps leave this area, but that's not the
9  allegation in this case.

10         With respect to the weight of the evidence, the
11 government itself says notwithstanding the sworn affidavit of the
12 agent, they have not corroborated any of the information about
13 Somalis entering the United States, but let's imagine that they
14 had, Your Honor.  Let's imagine that they found a Somali in the
15 United States who says, "Yes, I was in Kenya.  I used Mr. Tracy's
16 travel service to obtain travel documents to Cuba, and then I went
17 to Cuba, and on my own, I then traveled from Cuba to South America
18 and from South America to Mexico and then into the United States."

19         Would that constitute a violation of the statute?  I'd
20 suggest no.  The statute requires encouragement to come into or
21 enter the United States, and there's not one case that applies the
22 statute to this type of factual circumstance.

23         That weighs in favor strongly of release in this case,
24 because we simply do not have another case of this type, and the
25 allegations are the government doesn't even corroborate the

1  information that it has in the complaint.

2          The other considerations for the Court are the history

3  and circumstances of the defendant and the seriousness of any

4  danger, and it's clear that this is not someone, I believe, that

5  the government would allege is a danger to the community.  The

6  only question is based on his history and circumstances, is there

7  a risk of flight that cannot be addressed by any condition of

8  release.

9          We have an individual here who has cooperated with law

10  enforcement and with ICE since 2002, who has been paid for his

11  cooperation, a person who has ties, significant ties to this

12  community, that is, a wife and five children, ages 10, 8, 6, 5,

13  and 2, and the government's allegation here is that his desire to

14  flee or inclination to flee is so strong that he would leave this

15  community and leave his five young children behind forever.

16          There simply is no evidence to suggest that that is so.

17  There's no evidence to suggest either that he has the ability to

18  obtain travel documents, of which he has none.  His passport was

19  seized.  There is no evidence to suggest that he has the

20  inclination to flee.

21          The government continues to state that he expressed his

22  desire to return to Kenya.  He told that to the investigators in

23  this case before his arrest.  That's where his company was.

24          He was asked to come back to this country, he did so,

25  and he expressed a desire to return to Kenya.  That's not a reason

1  to believe he would flee.  That's a reason to believe that if this

2  case was never brought, he would return to Kenya, as he is allowed

3  to do so.

4          Because of the nature of the allegations in this case,

5  he is determined to stay in this jurisdiction, to fight the

6  allegations against him, to prove that he has not committed any

7  crime.

8          And so when the government provides in their, in their

9  motion that there are no conditions that can reasonably assure his

10 appearance at future hearings, they really have no factor under

11 3142 that weighs in their waiver.  There is certainly nothing

12 about the case itself or the weight of the evidence that weighs in

13 favor of detention.

14         And with respect to his history and characteristics, we

15 don't have just a regular citizen who has not been involved with

16 law enforcement before.  We have an individual who has worked with

17 law enforcement providing information and did so in this case and

18 cooperated when he came back and was asked to come back

19 voluntarily to this country.

20         Under the circumstances, given his ties to the

21 community, the availability of a third-party custodian, we believe

22 that there are conditions that would reasonably assure his

23 appearance at future hearings and that this is not even a close

24 case, as I mentioned in our papers.  It simply is one in which the

25 Court can establish conditions of reside with a third-party

custodian, restricts travel to this area, be monitored by Pretrial

2  Services, and sign a personal recognizance bond.

3           This is someone who understands the nature of the

4  charges against him and wants to fight them, and he wants to stay

5  here to do that, and he wants to reside with his family, and for

6  that reason, we believe there are conditions that would reasonably

7  assure his appearance.

8           THE COURT:  Tell me more about this business in Kenya.

9  How many employees are in the business?

10           MR. KAMENS:  With the Court's indulgence?

11           He had two employees, Your Honor.  The business was

12  closed down in November.

13           And just to be clear, he denies that he ever provided

14  fraudulent documentation to anyone.  He did and freely admits that

15  he helped people to obtain travel documents to many countries,

16  including Cuba, but the business is not up and running, as I

17  understand it, at this time.  And even the contacts that he

18  allegedly had at the Cuban embassy have been terminated according

19  to the complaint, so there's not even an allegation that he could

20  continue engaging in the behavior that's alleged in the complaint

21  in this case.

22           THE COURT:  And what kind of rent was he paying for the

23  building, for the office?

24           MR. KAMENS:  In Kenya, Your Honor?

25           THE COURT:  Yeah.

32

1          MR. KAMENS: As I understand it, the rent was $120 a
2   month, Your Honor.
3          THE COURT: And when did he first open that business?
4          MR. KAMENS: As I understand it, he traveled to Kenya in
5   April of '09. It took him several weeks, perhaps six weeks to
6   open a business.
7          THE COURT: Had he ever been involved in a travel
8   business in the United States?
9          MR. KAMENS: I don't think so. If I can just confirm --
10         THE COURT: I didn't see that in the Pretrial Services
11  report.
12         MR. KAMENS: No, Your Honor.
13         THE COURT: And what's your understanding of the total
14  amount of money the defendant has been paid by the U.S. government
15  to provide information?
16         MR. KAMENS:
17
18
19
20         THE COURT: That's not what he told Pretrial.
21         MR. KAMENS: Well, we're proffering that to the Court.
22         THE COURT: All right. Ms. Linehan?
23         MS. LINEHAN: Your Honor, if I could just direct Your
24  Honor's attention to two paragraphs in the original affidavit in
25  support of the complaint, and this is that the affidavit that

1  Agent Eyre swore to, page 3, paragraph 7, Tracy admitted that he
2  would help the aliens by providing and manufacturing fake
3  documents that are required to obtain Cuban visas, such as bank
4  statements reflecting residency in Kenya.   These were to get Cuban
5  visas from the Cuban embassy in Kenya, and the documents required
6  for that were things that would provide an indicia of residency in
7  Kenya; in other words, people are returning.

8          He indicated to the FBI and ICE that he manufactured
9  fake documents to do that for these people, and he charged money
10  to do that.   This wasn't a legitimate travel business.   He was
11  providing fake documents so people could get visas that they
12  wouldn't have ordinarily been eligible to get.

13          Also, Your Honor, on -- in the affidavit, on page 5,
14  paragraph No. 16, this paragraph is very relevant -- I'm sorry,
15  paragraph 14 -- to Your Honor's consideration.   It's an e-mail
16  from Tracy dated January 15, 2010, and it was sent in response to
17  an e-mail the defendant received.   In it he says, "I will be back
18  in Kenya at the end of February, so contact me then, and I will
19  assist you, inshalla.   I helped a lot of Somalis, and most are
20  good, but there are some who are bad, and I leave them to Allah."

21          Your Honor, we have no idea who these individuals are
22  that he assisted.   These individuals pose -- possibly pose a risk
23  of national security to this country.

24          He also, Your Honor, admitted when he spoke to the
25  agents that he had been approached by Al-Shabaab in Kenya.

1   Although he had denied assisting them, it was that portion of the
2   polygraph examination that he failed, and I understand that Your
3   Honor can't take that into consideration.  I just offer it to you
4   in the context of we have no idea who these individuals are.

5          And the reason why these individuals are important, Your
6   Honor, for your consideration of detention is because if there are
7   270 of these people in this country that he assisted, it's high
8   time for paybacks to him, so if he gets out, he potentially has
9   270 individuals in this country who he assisted through illegal
10  means who he can reach out to and say, "Time for a payback.  Get
11  me back to Kenya."

12         In addition to that, Your Honor, he indicated that he
13  had been approached by pirates.  He said -- he stated in an e-mail
14  that he had been approached by retired pirates.

15         Your Honor, the work at Noor Services that he did
16  required the use of corrupt embassy employees, two of which he
17  named, a woman named Consuela and Helen.  That demonstrates to the
18  Court that he has access to corrupt individuals in embassies,
19  possibly not just the Cuban embassy in Kenya but throughout the
20  world, because as Your Honor knows, when people begin in this sort
21  of travel business where they're smuggling, it's vital to their
22  business to establish contacts throughout the world in different
23  embassies so that when individuals are fired, you can replace
24  those individuals and you can have a seamless operation.

25         And, Your Honor, with that, I would rest on the

1   remaining items in my, in my opposition.

2          THE COURT:  Mr. Kamens?

3          MR. KAMENS:  If I can just make two quick comments, Your
4   Honor?  The e-mail about the pirates was sent to ICE by Mr. Tracy
5   in an effort to provide information.  It's not a reason to hold
6   him now, nor is the government's statement that they have no idea
7   who these 270 people are that they allege or fear are in the
8   United States.  It is the government's burden to establish that
9   Mr. Tracy has committed a violation of the law, and the fact that
10  they don't know and haven't confirmed that these people exist is a
11  basis to find that Mr. Tracy should not be held for a criminal
12  violation.

13         I understand the government's fear about polygraph or
14  their concern about pirates, but that's not what we're here about.
15  We're here to determine whether he should be detained because he
16  allegedly encouraged individuals who the government freely admits
17  has no idea whether they actually exist into the United States.

18         THE COURT:  Well, there's no question if this were at
19  the trial level, where the standard is proof beyond a reasonable
20  doubt, that the Court would have to acquit the defendant at this
21  point, but that's not where we're at.  We're at a preliminary
22  stage in a criminal proceeding where the standard is different.

23         The first standard in terms of the initial complaint in
24  the charging documents is a standard of probable cause, and I'm
25  satisfied that the information in the affidavit made under the

1 | penalty of perjury is more than sufficient to establish probable
2 | cause to continue holding the defendant for a federal crime.
3 | Whether the government can prove it is a different matter.

4 | So the issue then -- I agree with the defense counsel
5 | that this is not an offense which falls under the presumption list
6 | of defenses.  This is not considered at this point a crime of
7 | violence.  If down the road there are national security ties that
8 | are not yet affirmatively established in the case, that could
9 | totally change that analysis, but for purposes of considering the
10 | bond, the Court will not have a presumption to work with in this
11 | case.

12 | And whether there's a risk of violence, again, I don't
13 | think that in this case there's any evidence of that.

14 | The real concern that Judge Buchanan certainly had and
15 | that this Court has as well and what frankly has been focused upon
16 | the most is the likelihood of the defendant's not being here for
17 | trial, in other words, the flight risk element, and in this case,
18 | I find that the government has met its burden of establishing that
19 | there is significant evidence of flight risk, and the defendant
20 | has not satisfied the Court with the evidence that's on the record
21 | that he is not a flight risk.

22 | The nature of the case involving the preparation of
23 | false documents, be they bank records, driver's license, or
24 | whatever, if you can get your hands on false documents, the
25 | implication is an increased likelihood that a person could get or

1  make false documents for himself which would help him to abscond.

2

3

4

5

6

7

8          He clearly has access to people in consulates who are,

9  from the evidence in the record so far, who are willing to violate

10  the law and to accept false documents, and I find that the

11  inconsistent statements made to Pretrial Services about bona fides

12  such as sources of income, amounts of income, ties to this area,

13  are very problematic.  I don't find on this record that there are

14  strong ties at all to Northern Virginia.

15          The argument that the defendant is so tied to his wife

16  and five children that he would leave, the significant amounts of

17  time that he was gone for, what, seven or eight months in Kenya

18  most recently, the evidence that his plan was to go back to Kenya,

19  that does not show the kind of strong family ties that would

20  normally be considered reliable.

21          Given those factors, I find that Judge Buchanan did not

22  err as a matter of law nor was she incorrect in her fact finding,

23  and the Court is going to deny the motion for release, and the

24  bond will stay in place.

25          I believe that that concludes the proceeding.  As I

1  said, we'll have this transcript reviewed, and to the extent that
2  it is, if at all it's classified, we'll have a redacted transcript
3  made available.  All right?

4              Anything further in this case?  No?

5              MR. KAMENS:  Nothing further, Your Honor.

6              THE COURT:  The defendant is remanded at this time.

7                         (Which were all the proceedings

8                              had at this time.)

9

10                    CERTIFICATE OF THE REPORTER

11     I certify that the foregoing is a correct transcript of the

12  record of proceedings in the above-entitled matter.

13

14

15     _____

                    Anneliese J. Thomson

16

17

18

19

20

21

22

23

24

25